Andrew N. Friedman (DC Bar 375595)
Victoria S. Nugent (DC Bar 470800)
Julie Selesnick (DC Bar 485558)
Geoffrey Graber (*pro hac vice forthcoming*)
Eric Kafka (*pro hac vice forthcoming*)
Karina G. Puttieva (*pro hac vice forthcoming*)
Paul Stephan (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
vnugent@cohenmilstein.com
jselesnick@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com
kputtieva@cohenmilstein.com
pstephan@cohenmilstein.com
*Counsel for Plaintiffs*

Eric H. Gibbs (*pro hac vice forthcoming*)
ehg@classlawgroup.com
Andre M. Mura (DC Bar 492837)
amm@classlawgroup.com
Karen Barth Menzies (*pro hac vice forthcoming*)
kbm@classlawgroup.com
Amy M. Zeman (*pro hac vice forthcoming*)
amz@classlawgroup.com
Steve Lopez (*pro hac vice forthcoming*)
sal@classlawgroup.com
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FT DC, LLC T/A FIOLA; FT CASA LUCA DC, LLC T/A SFOGLINA DOWNTOWN; FT MARE DC, LLC T/A FIOLA MARE; FT CASA LUCA DC II, LLC T/A SFOGLINA VAN NESS; FT DEL MAR DC LLC T/A DEL MAR; and FT SFOGLINA VA LLC T/A SFOGLINA ROSSLYN, <br><br> Plaintiffs, <br><br> v. <br><br> THE CHARTER OAK FIRE INSURANCE COMPANY, <br><br><br> Defendant. | Civil Action No. <br><br> **COMPLAINT FOR DAMAGES** <br><br> (1) Declaratory Judgment <br> (2) Breach of Contract <br> (3) Breach of Implied Covenant of Good Faith and Fair Dealing <br><br><br> **DEMAND FOR JURY TRIAL** |

**COMPLAINT**

FT DC, LLC T/A FIOLA; FT Casa Luca DC, LLC T/A Sfoglina Downtown; FT Mare DC, LLC T/A Fiola Mare; FT Casa Luca DC II, LLC T/A Sfoglina Van Ness; FT Del Mar DC LLC T/A Del Mar and FTDC T/A Sfoglina VA LLC T/A Sfoglina Rosslyn (collectively "FT GROUP" or "Plaintiff") hereby files suit against The Charter Oak Fire Insurance Company ("Charter Oak" or "Defendant") and alleges the following.

**INTRODUCTION**

1.      Governments around the world have enacted stringent countermeasures in order to combat the COVID-19 pandemic, requiring the closure of many businesses and restricting almost all public activities.

2.      Restaurants, in particular, have suffered immediate and precipitous losses.  This impact on restaurants will have a devastating impact on the nation's economy and social life. As of 2016, Americans spend more than half of their food budget eating outside the home. According to The Brookings Institution, food preparation and service is the second most common occupation in the United States; waiting tables is the eighth most common.  At the start of 2020, there were more than 12 million Americans working at over 600,000 food service and drinking establishments nationwide. *Food & Wine* reports that approximately 8 million restaurant workers have been laid-off or furloughed since mid-March. Before the COVID-19 pandemic materialized, the National Restaurant Association predicted 2020 sales would be $899 billion. As of June 15, 2020, the Association's research shows that restaurants lost $120 billion in sales during the first three months of the COVID-19 pandemic. The outlook is dire for the tens of thousands of restaurants that may never reopen.

3.      FT GROUP bought full-spectrum, comprehensive insurance to protect all aspects of the insured businesses – not just for damage to insured premises and equipment – but also for interruptions in business operations that result in loss of business income.  FT GROUP believed that it had purchased comprehensive coverage that would apply to business interruptions under

circumstances like this, where Plaintiff has done everything right to protect its businesses and the public. Such coverage is important, if not vital, because profit margins in the restaurant industry are slim and, unlike in the insurance industry, reserve funds tend to be low. Hence, business interruptions are a particular concern of this industry.

4.      Charter Oak, from whom Plaintiff purchased such insurance, swiftly denied the claim. Though its reasons are cursory, the denial appears to be based on an unreasonable reading of its policy, which tracks form policies issued by Defendant on a take-it-or-leave-it basis. Defendant denied the claim despite having pocketed significant premiums for the many policies it has issued to FT GROUP over the years. Plaintiff has been purchasing comprehensive business insurance from Charter Oak for many years; the provisional premium for this year's policy alone is $163,934.

5.      This arbitrary and wrongful denial of insurance benefits leaves FT GROUP financially insecure and threatens the survival of one or more of FT GROUP's six restaurants covered under the policy.

6.      Plaintiff thus brings this action seeking declaratory relief and damages.

## PARTIES

7.      FT DC T/A  Fiola is a limited liability company formed under the laws of the District of Columbia in September 2010, with its principal place of business also located in the District of Columbia.  FT DC, LLC and its affiliated restaurant businesses (collectively, the FT GROUP) have jointly purchased insurance through FT DC, LLC since each of the affiliated restaurants opened for business from 2013 to 2019.  The entities that make up the FT GROUP are co-owned and managed by famed chef Fabio Trabocchi. The FT GROUP currently operates (6) six restaurants in the mid-Atlantic region. There are two additional restaurants affiliated with

Fabio Trabocchi through management and license agreements, one in Miami and one in Venice, Italy; that are not part of this action as they are not insured under the Charter Oak policy. The six (6) restaurants covered under the Charter Oak policy and relevant to this action are (1) Fiola DC; (2) Fiola Mare; (3) Del Mar; (4) Sfoglina Van Ness; (5) Sfoglina Downtown; and (6) Sfoglina Rosslyn. The first five (5) restaurants are located in the District of Columbia, and the final one (1), Sfoglina Rosslyn, is located in Northern Virginia in Arlington County.

8.      Defendant The Charter Oak Fire Insurance Company is a Travelers company and a corporation organized under laws of Connecticut with its principal place of business in Hartford, Connecticut. At all relevant times, Defendant conducted business in Washington, D.C.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because Plaintiffs and Defendant are citizens of a different states.

10.      This Court has personal jurisdiction over Charter Oak because Charter Oak conducts business in Washington, D.C.

11.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the instant action occurred in Washington, D.C.

## FACTUAL BACKGROUND

### I.      THE ONSET OF THE COVID-19 PANDEMIC

12.      In January 2020 early media reports documented an outbreak of a novel strain of coronavirus – COVID-19 – in Wuhan, China.  By late January, it was generally understood in the scientific and public health communities that COVID-19 was spreading through human-to-human transmission and could be transmitted by asymptomatic carriers.

13.     On January 30, 2020, reports of the spread of COVID-19 outside China prompted the World Health Organization to declare the COVID-19 outbreak a "Public Health Emergency of International Concern."

14.     On March 11, the World Health Organization declared COVID-19 a global health pandemic based on existing and projected infection and death rates and concerns about the speed of transmission and ultimate reach of this virus.

15.     Public health officials have recognized for decades that non-pharmaceutical interventions (NPIs) can slow and stop the transmission of certain diseases.  Among these are screening and testing of potentially infected persons; contact tracing and quarantining infected persons; personal protection and prevention; and social distancing.  Social distancing is the maintenance of physical space between people.  Social distancing can be limited – *e.g.*, reducing certain types of conduct or activities like hand-shaking – or large-scale – *e.g.*, restricting the movements of the total population.

16.     A lack of central planning, shortages of key medical supplies and equipment, and the unfortunate spread of misinformation and disinformation about the risks of COVID-19 has led to widespread confusion, unrest, and uncertainty regarding the likely trajectory of this pandemic and the appropriate counter-measures necessary to mitigate the damage it could potentially cause.

17.     Beginning in late February, public health officials began advising various governments around the world that one of the most disruptive NPIs – population-wide social distancing – was needed to stop the transmission of COVID-19. Suddenly densely occupied spaces, heavily traveled spaces, and frequently visited spaces such as schools, offices, public transit, restaurants, and shops were likely to become hot-spots for local transmission of COVID-

19. By mid-March, that advice was being implemented by state and local governments across the United States, including in the District of Columbia and Virginia, both of which issued a series of orders ("Public Health Orders") placing significant limitations on public activities and private gatherings to limit the spread of COVID-19.

## II.     PUBLIC HEALTH ORDERS AFFECTING PLAINTIFFS' RESTAURANTS

18.     FT GROUP operates five restaurants in the District of Columbia and one restaurant in Virginia which are covered locations under the Charter Oak policy. Both jurisdictions have issued a series of Orders that have resulted in the partial or complete closure of all of FT GROUP's covered restaurants.

A.     <u>District of Columbia</u>

19.     Beginning in March 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued a series of Public Health Orders. In order to comply with the Public Health Orders, many D. C. businesses, including FT GROUP's restaurants and the surrounding businesses, were forced to abandon their property and suspend ordinary business activity.

20.     On March 11, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Orders 2020-045 and 2020-046, which declared a public emergency and a public health emergency in the District of Columbia. These Orders went into effect immediately and were to remain in effect until at least March 26.

21.     On March 16, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-048. The Order prohibited gatherings of more than fifty people. It also prohibited table seating at any restaurant in the District of Columbia beginning at 10:00 pm that night until April 1, 2020 at 6:00 am. Order 2020-048 stated that violators would be

subject to criminal, civil, and administrative penalties, including summary suspension of licensure. The Order went into effect immediately and was to remain in effect at least through March 31, 2020.

22.    On March 20, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-051, which extended the specific prohibition of gatherings of more than fifty persons and table seating at restaurants and, in addition, specifically prohibited service to standing customers. Order 2020-051 stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension of licensure. This Order went into effect immediately and was to remain in effect at least through April 24, 2020.

23.    On March 24, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-053, which prohibited large gatherings of ten or more people, mandated closure of all on-site operations of non-essential businesses, and specifically limited restaurants to delivery, carry out, and "grab and go" service only. Order 2020-053 stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure. This Order went into effect at 10:00 p.m. on March 25, 2020 and was set to remain in effect at least through April 24, 2020.

24.    On March 30, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-054, a Stay-At-Home Order, ordering all individuals living in Washington, DC, to stay at their place of residence, except to obtain food and essential household goods or to engage in Essential Business Activities. The Stay-At-Home Order stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure. This Order went into effect at 12:01 a.m. on April 1, 2020 and was set to remain in effect through at least April 24, 2020.

25.     On April 8, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-058, which mandated that all restaurants mark six foot distances outside and within their location to manage lines of customers and adopt social distancing requirements similar to those imposed on grocery stores and other retail food sellers, such as maintaining a minimum distance of six feet from each person who is not part of the same household. This Order went into effect at 12:01 a.m. on April 9, 2020 and was set to remain in effect at least through April 24, 2020.

26.     On April 15, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-063, which extended Order 2020-053 and the Stay-At-Home Order (Order 2020-054) until May 15, 2020. Order 2020-063 also extended the public emergency and public health emergency in the District of Columbia until May 15, 2020. Order 2020-063 stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure, and specified that individuals "should call 311 to report any suspected violations of this or other Mayor's Orders related to the COVID-19 public health emergency." This Order went into effect at 12:01 a.m. on April 17, 2020 and was set to remain in effect at least through May 15, 2020.

27.     On May 13, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-066, which extended the public emergency and public health emergency (declared by Orders 2020-045 and 2020-046, respectively) and all previous COVID-19-related orders through June 8, 2020. This Order also required masks to be worn by employees, independent contractors, customers, and visitors of essential businesses and others, and it continued to prohibit large gatherings of more than ten individuals. Order 2020-066 stated that violators would be subject to criminal, civil, and administrative penalties, including

summary suspension or revocation of licensure, and instructed individuals to call 311 to report violations. This Order went into effect at 12:01 a.m. on May 16, 2020 and was set to remain in effect at least through June 8, 2020.

28.     On May 27, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-067, which declared the District to be in Phase One of reopening and lifted the Stay-At-Home Order. The Order continued to require mask wearing and social distancing and to prohibit large gatherings of more than ten individuals. It allowed restaurants and other licensed food establishments to open for outdoor dining, subject to conditions including that tables seat no more than six individuals and that tables be at least six feet apart. Order 2020-067 extended the public emergency and public health emergency (declared by Orders 2020-045 and 2020-046, respectively) through July 24, 2020, and extended all previous COVID-19-related orders unless otherwise modified or superseded. The Order stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure, and instructed individuals to call 311 to report violations. This Order went into effect at 12:01 a.m. on May 29, 2020.

29.     On June 19, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-075, which declared the District to be in Phase Two of reopening. The Order continued to require mask wearing and social distancing. It replaced the prohibition on large gatherings of more than ten individuals with a prohibition on large gatherings of more than fifty individuals. The Order permitted licensed food establishments to open for indoor dining, subject to conditions including that the establishment remain at or below 50% of occupancy, that tables seat no more than six individuals or allow for six feet between groups, that tables be at least six feet apart, that bar seating be prohibited if a bartender is

working there, that indoor queuing is not allowed, and that patrons queuing outdoors be separated by at least six feet. Order 2020-075 stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure, and instructed individuals to call 311 to report violations. This Order went into effect at 12:01 a.m. on June 22, 2020 and remains effective for the duration of public health emergency.

      B.    <u>Virginia</u>

      30.    Beginning in March 2020, the Commonwealth of Virginia issued a series of Public Health Orders. In order to comply with the Public Health Orders, many Virginia businesses, including FT GROUP's Rosslyn, Virginia restaurant and the surrounding businesses, were forced to abandon their property and suspend ordinary business activity. On March 12, 2020, Governor Ralph S. Northam issued Executive Order Number 51, declaring a state of emergency until June 10, 2020. On May 26, 2020, Governor Northam issued Executive Order Amended Number 51, extending the state of emergency indefinitely.

      31.    On March 17, 2020, Governor Northam and State Health Commissioner M. Norman Oliver issued an Order declaring a public health emergency. The Order also restricted restaurants to ten or fewer patrons. Violations are punishable as a misdemeanor and can result in suspension of operation permits.

      32.    On March 23, 2020, Governor Northam issued Executive Order Number 53. The Order prohibited all gatherings of ten or more people, effective at 11:59 p.m. on March 24, 2020. It further required closure of all restaurants effective at the same time. Violations of the relevant portions of the Order constitutes a Class 1 misdemeanor. This Order was extended twice. The second time extended the ten-person-gathering restriction until June 10, 2020 and the restaurant-closure provision until May 14, 2020.

33.     On March 30, 2020, Governor Northam issued Executive Order Number 55, a "Temporary Stay at Home Order Due to Novel Coronavirus (COVID-19)." The Order prohibited individuals from leaving their place of residence except for a set of enumerated activities, which did not include patronizing restaurants. The Order was set to remain in effect until June 10, 2020.

34.     On May 8, 2020, Governor Northam issued Executive Order Number 61, which promulgated rules for Phase One reopening. The Order allowed restaurants to operate carry-out, delivery, and outdoor services only, provided that the restaurant not exceed 50% occupancy in the outdoor space, that no more than 10 patrons are seated as a party, that tables are at least six feet apart, and that other conditions are met. The Order became effective on May 15, 2020.

35.     On May 12, 2020, Governor Northam issued Executive Order Number 62. The Order exempted Arlington and Fairfax Counties and the Town of Vienna (the "Northern Virginia Region") from Executive Order No. 61 and kept them at Phase Zero. Staying in Phase Zero meant all restaurants stayed closed (except for carry-out and delivery services) and individuals were still required to remain at their place of residence except to engage in enumerated activities.

36.     On June 2, 2020, Governor Northam issued Executive Order Number 65, announcing further eased restrictions consistent with Phase Two. For regions moving to Phase Two, restaurants may operate carry-out, delivery, indoor, and outdoor services, provided that the restaurant's occupancy not exceed 50% what is allowed in the certificate of occupancy, that no more than 50 patrons are seated as a party, that tables are at least six feet apart, and that other conditions are met. This Order explicitly exempted the Northern Virginia Region.

37.     On June 5, 2020, Governor Northam issued Executive Order Third Amended Number 61, which moved Northern Virginia to Phase One. Executive Order Amended Number

65, issued on June 9, 2020, stated that the Northern Virginia Region would remain in Phase One while much of the rest of the Commonwealth moved to Phase Two.

38.     On June 30, 2020, Governor Northam issued Executive Order Number 67, implementing Phase Three of reopening throughout the Commonwealth. The Order allowed restaurants to operate carry-out, delivery, indoor, and outdoor services, provided that parties are separated by six feet, including in the bar area.

39.     FT GROUP's Virginia restaurant is located in Rosslyn, VA; the Northern Virginia Region.

## PLAINTIFFS' EXPERIENCE

40.     FT GROUP is comprised of six related but separate companies, each of which operates one of the restaurants covered under the Charter Oak policy and relevant to this action: (1) Fiola DC; (2) Fiola Mare; (3) Del Mar; (4) Sfoglina Van Ness; (5) Sfoglina Downtown; and (6) Sfoglina Rosslyn.

41.     The FT GROUP entities are co-owned by a group of investors, and world-renowned chef Fabio Trabocchi is a co-owner and acts as a co-managing member of each of the entities that runs the six restaurants. In 2002, he was named as one of the Best New Chefs by Food & Wine. He then won the prestigious James Beard Foundation Award in 2006 for Best Chef, Mid-Atlantic region, has been awarded a Michelin star at two different restaurants, and was named Chef of the Year in 2013 by the Restaurant Association Metropolitan Washington (RAMMY Awards). He was also named the Restaurateur of the Year in 2015 by Washingtonian Magazine.

42.     Through hard work and the dedication of Fabio Trabocchi and the team he assembled, FT GROUP has experienced tremendous success and recognition. Fiola DC, the first of the FT GROUP restaurants to open in 2011, won Best New Restaurant at the 2012 RAMMY

Awards, and was named by Bon Appétit magazine as one of the 50 best new restaurants in America. In 2014, Fiola DC won the RAMMY Award for Best Formal Dining Restaurant, and in the inaugural Michelin Guide for Washington, D.C., Fiola DC received one Michelin star. In 2015, Fiola Mare won the RAMMY Award for Best New Restaurant, and Del Mar, which opened in 2017, earned the top spot on Washington Post food critic Tom Sietsema's list of top ten restaurants in Washington DC for 2018.

43.   FT GROUP's restaurants were subject to the Public Health Orders reproduced above, and FT GROUP has complied with all of the Public Health Orders. As a result of these Public Health Orders, all of FT GROUP's restaurants were forced to either close or seriously curtail their operations.

44.   These business interruptions have caused direct loss of FT GROUP's insured property in that the restaurants and their equipment, furnishings, and other business personal property have been made unavailable, inoperable, useless and uninhabitable, and their functionality has been severely reduced if not eliminated. The impact of the Public Health Orders is felt not simply in their direct application to FT GROUP's operations, but also in their application to the businesses and properties surrounding FT GROUP's restaurants in Washington DC and Northern Virginia which are subject to the Public Health Orders. As a result of these losses, FT GROUP's business income has also plummeted, and in some cases ceased entirely.

45.   FT GROUP employed approximately  550 people who live in D.C., Maryland and Virginia, just before the Public Health Orders resulted in the closure of the restaurants. At the worst point, when all of the restaurants were fully closed, more than 80% of these employees had to be laid off.  FT GROUP responded to the crisis by creating the Fabio Trabocchi Disaster Relief Fund which they seeded with the initial funds and for which they have raised money since

the restaurants were impacted by the Public Health Orders.  To date, the Fund has distributed more than $150,000 to their own employees as financial assistance to help them manage through the crisis without being able to work to support themselves.

46.     FT GROUP has also done everything possible to mitigate damages, opening each location as soon as practicable initially switching over to a carryout/delivery-geared enterprise to maximize revenue when zero occupancy was allowed. By doing so, they progressively have been able to hire back approximately 240 of their employees already – more than 50% of the employees on their payrolls prior to the issuance of the Public Health Orders.

47.     Even as some jurisdictions have begun to rescind or revise their Public Health Orders to allow for more business to be conducted, Plaintiff is likely to experience ongoing restrictions and residual effects, given that the pandemic spread still remains uncontrolled and densely occupied public spaces remain unsafe as places where the risk of transmission remains high. Some revised Public Health Orders may make it harder for Plaintiff to continue existing operations.

48.     FT GROUP purchased a comprehensive commercial liability and property insurance policy (the "Policy") from Charter Oak – with a policy period of March 31, 2019 to March 31, 2020 – to protect itself against all risks that it might face, including those risks that might cause interruptions to the covered restaurant businesses and result in lost business income.

49.     FT GROUP is comprised of food and beverage professionals who excel at operating restaurants; they are not risk assessment professionals aware of every possible catastrophe that might occur which could cause its restaurants to close.  In its dealings with Charter Oak, FT Group was a consumer, and what it cared about was being covered by insurance under any circumstances that might cause its restaurants to close. Charter Oak, on the other hand,

is in the business of predicting catastrophes and has been aware of the potential for a COVID-19-type pandemic for at least a decade, if not longer.

50.     There are many extensions of coverage in the Policy, including coverage for loss of business income with extra expense and coverage for business income from dependent property. Once triggered, the Policy pays actual losses sustained for the business income and extra expense coverage up to a per occurrence limit of $11,000,000.00. The Policy also provides "civil authority" coverage and "ingress or egress" coverage if all qualifying conditions are met.

51.     The Policy was not individually negotiated. The Policy's substantive terms were set unilaterally by Charter Oak, were not subject to individual negotiation by FT GROUP, and were presented to FT GROUP on a "take it or leave it" basis, despite the hefty premiums charged. Subsequent amendments to the original terms – called endorsements – were also unilaterally imposed.

52.     FT GROUP was never informed by Charter Oak that for the business income and extra expense coverage to apply, there would need to be visible physical damage to property. The Policy also does not say this anywhere, nor does it define the terms "loss" or "damage".

53.     To date, FT GROUP has paid all of the premiums required by Defendant to keep the Policy in full force, and has met all applicable conditions precedent in order to receive payment under the Policy and to recover the lost business income and extra expenses that have resulted from the Public Health Orders closing and/or severely restricting FT GROUP's restaurants.

54.     Shortly after the restaurants were forced to close, FT GROUP, through their insurance broker, reported a loss of business income as of March 15, 2020, for the five restaurants in Washington D.C. and the one restaurant in Northern Virginia insured under the

Policy.

55.     On April 2, 2020, Charter Oak denied FT GROUP's claim for direct physical loss of property and actual loss of business income sustained during the suspension of operations as a result of the loss of the use of property for each of the six restaurants.  In a cursory denial letter, Charter Oak took the position that Plaintiffs did not have business income and extra expense coverage because, in relevant part, (a) there was no direct physical loss or damage at the insured premises; (b) the policy excludes loss or damage caused by or resulting from any virus; and (c) business income losses that are caused by or result from "loss of use or loss of market", "contamination by other than 'pollutants'", and/or "acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body" are excluded from coverage under the Policy.

56.     Charter Oak's denial letter appears to be a form letter prepared to send in response to business interruption claims arising from the Public Health Orders by customers who purchased the same or substantially similar comprehensive business insurance policies.

57.     The denial letter does not define "direct," "physical," "loss," or "damage," and the Policy does not either.

58.     Charter Oak's denial is contrary to the terms and conditions of the Policy and applicable law, which give effect to plain language, construe ambiguity in favor of coverage, and narrowly construe exclusions, the applicability of which insurers have the burden of proving.

59.     FT GROUP's restaurants were ordered to suspend or severely curtail business due to the various Public Health Orders, which are covered causes of loss as defined in the Policy. As a result of the suspensions, FT GROUP has suffered the physical loss of its insured real and personal property. As such, the Policy's coverage for losses to business income and extra

16

expenses are triggered. The Policy's coverages for business income from dependent property, civil authority, contract penalties, and ingress or egress are also likely triggered.

60.    FT GROUP has suffered and will continue to suffer damages due to Charter Oak's wrongful denial of insurance coverage, which FT GROUP acquired to sustain its business and protect its employees and the continued viability of the restaurants in circumstances such as these.

**Count I: Declaratory Judgment**

61.    FT GROUP re-alleges and incorporates by reference all the allegations contained in paragraphs 1 through 60.

62.    FT GROUP purchased the Policy which provides comprehensive business insurance from Charter Oak.

63.    FT GROUP met all or substantially all of its contractual obligations, including by paying all the premiums required by Charter Oak.

64.    The Policy includes provisions that provide coverage for the direct physical loss of use of Plaintiff's insured premises and equipment as well as actual loss of business income and extra expenses sustained during the suspension of operations as a result of the loss of use and risk of physical loss.

65.    Beginning in March 2020, state and local governments issued a series of Public Health Orders that severely restricted access to FT GROUP's business premises.

66.    As a result of these Public Health Orders, FT GROUP lost the use of its business property and lost substantial business income as a result of the loss of the use of its business property.

67.    These losses are insured losses under several provisions of FT GROUP's Policy, including provisions covering direct loss of property, loss of business income, extended loss of

business income, and business income from dependent properties.

68.     There are no applicable, enforceable exclusions or definitions in the Policy that preclude coverage for these losses.

69.     Wherefore, Plaintiff seeks a declaration that its business income losses are covered and not precluded by exclusions or other limitations in the Policy.

## Count II: Breach of Contract

70.     FT GROUP re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 69.

71.     FT GROUP purchased the Policy from Charter Oak to ensure against all risks (unless specifically excluded) its businesses might face. The Policy is a binding contract that is supposed to provide FT GROUP with comprehensive business insurance under its terms and conditions.

72.     FT GROUP met all or substantially all of its contractual obligations, including by paying all the premiums required by Charter Oak.

73.     Beginning in March 2020, state and local governments in Washington DC and Virginia issued a series of Public Health Orders that severely restricted access to FT GROUP's business premises.

74.     As a result of these Public Health Orders, FT GROUP lost the use of its business property and lost substantial business income as a result of the loss of the use of its business property.

75.     These losses are insured losses under several provisions of FT GROUP's Policy, including provisions covering direct loss of property, loss of business income, extended loss of business income, and business income from dependent properties.

76.     There are no applicable, enforceable exclusions in the Policy that preclude coverage.

77.     Charter Oak breached the contract by denying comprehensive business insurance coverage to Plaintiff.

78.     As a direct and proximate result of Charter Oak's denial of comprehensive business insurance coverage under the Policy, FT GROUP has suffered damages.

79.     Wherefore, FT GROUP seeks a judgment that Charter Oak has breached its contract with FT GROUP and corresponding damages for that breach.

**Count III: Breach of the Implied Covenant
of Good Faith and Fair Dealing**

80.     FT GROUP re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 79.

81.     FT GROUP contracted with Charter Oak to provide it with a Policy containing comprehensive business insurance to ensure against all risks (unless specifically excluded) a business might face.

82.     The contract was subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties – both explicit and fairly implied – and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contract. These included the covenants that Charter Oak would act fairly and in good faith in carrying out its contractual obligations to provide FT GROUP with comprehensive business insurance.

83.     Charter Oak breached the implied covenant of good faith and fair dealing by:

a.   Selling an insurance policy that appears to provide liberal coverage for loss of property and lost business income, knowing that it would interpret

19

poorly defined terms, undefined terms, and ambiguously written exclusions to deny coverage under circumstances foreseen by Charter Oak but not Plaintiff;

b. denying coverage for loss of property and lost business income by invoking undefined, ambiguous, and contradictory terms that are inconsistent with the plain terms and purpose of the Policy;

c. denying FT GROUP's claims without adequate investigation or inquiry, arbitrarily and capriciously, and/or with knowledge that the denial was unreasonable under the Policy.

84.     FT GROUP met all or substantially all of its contractual obligations, including by paying all the premiums required by Charter Oak.

85.     Charter Oak's failure to act in good faith in providing comprehensive business insurance coverage to FT GROUP denied FT GROUP the full benefit of its bargain.

86.     Accordingly, FT GROUP has been injured as a result of Charter Oak's breach of the covenant of good faith and fair dealing and is entitled to damages in an amount to be proven at trial.

87.     Wherefore, FT GROUP seeks a judgment that Charter Oak has breached its covenant of good faith and fair dealing implied in its contract with Charter Oak and corresponding damages for that breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FT GROUP requests that the Court enter a judgment awarding the following relief:

(a)     A declaration that Plaintiff's losses are covered under the Policy;

(b)      Damages;

(c)      Attorneys' fees and costs; and

(d)      Such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

trial by jury in this action of all issues so triable.

21

July 24, 2020

Respectfully submitted,

*/s/ Andrew N. Friedman*

Andrew N. Friedman (DC Bar 375595)
Victoria S. Nugent (DC Bar 470800)
Julie Selesnick (DC Bar 485558)
Geoffrey Graber (*pro hac vice forthcoming*)
Eric Kafka (*pro hac vice forthcoming*)
Karina G. Puttieva (*pro hac vice forthcoming*)
Paul Stephan (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
vnugent@cohenmilstein.com
jselesnick@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com
kputtieva@cohenmilstein.com
pstephan@cohenmilstein.com

Eric H. Gibbs (*pro hac vice forthcoming*)
ehg@classlawgroup.com
Andre M. Mura (DC Bar 492837)
amm@classlawgroup.com
Karen Barth Menzies (*pro hac vice forthcoming*)
kbm@classlawgroup.com
Amy M. Zeman (*pro hac vice forthcoming*)
amz@classlawgroup.com
Steve Lopez (*pro hac vice forthcoming*)
sal@classlawgroup.com
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

*Attorneys for Plaintiffs*